## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COVERALL NORTH AMERICA, INC.,

Petitioner, 05 - 11870 MLW

vs.

MARCOS MARTINS,

Respondent.

Civil Action No.

RECEIPT # 66901
AMOUNT $ 250
SUMMONS ISSUED 4
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. _____
DATE 9/15/05

## PETITION TO COMPEL ARBITRATION

Petitioner, Coverall North America, Inc. ("Coverall"), by its attorneys, as and for its Petition to Compel Arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, states as follows:

### Nature Of The Action

MAGISTRATE JUDGE RB C

1. This is an action brought pursuant to § 4 of the Federal Arbitration Act, 9 U.S.C. § 4, to compel arbitration. Pursuant to a written Franchise Agreement entered into by and between Petitioner Coverall and Respondent Marcos Martins, the parties agreed to submit all disputes arising out of or relating to the Franchise Agreement, its validity or the relationship of the parties, to arbitration to be conducted in Massachusetts before the American Arbitration Association.

2. After certain disputes arose between the parties, and after the parties' efforts to mediate those disputes proved unsuccessful, Coverall commenced an arbitration proceeding against Respondent. Shortly after that arbitration proceeding commenced, Respondent's counsel advised the American Arbitration Association that Respondent disputed "that there is a valid arbitration agreement between [Respondent and seven other Coverall franchisees] and Coverall."

3.     By this action, Coverall seeks to compel Respondent to arbitrate the disputes set forth in Coverall's Demand for Arbitration, as well any counterclaims Respondent intends to assert against Coverall, as provided in the parties' written arbitration agreement.

## The Parties

4.     Petitioner Coverall is a Delaware corporation with its principal place of business in Boca Raton, Florida. Coverall is engaged in the business of granting franchises to qualified persons to operate commercial janitorial cleaning businesses, and to use Coverall's trade names and marks, as well as Coverall's operating system (the "Coverall® System"), in connection therewith. Coverall franchisees are provided with, among other things, training, equipment, billing and collection services, and a quality control program. Coverall also provides its franchisees customer accounts to clean. Under the Coverall System, Coverall enters into contracts with customers for cleaning services, and delegates the performance of the services under the contracts to its franchisees.

5.     Respondent Marcos Martins is a franchisee of Coverall. On information and belief, Respondent is a resident and citizen of the Commonwealth of Massachusetts.

## Jurisdiction and Venue

6.     This action arises under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*

7.     This Court has original subject matter jurisdiction of this action in that, save for the parties' agreement to arbitrate, this Court would have jurisdiction under 28 U.S.C. § 1332 of a civil action arising out of the controversy between the parties, in that the parties are citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.    Venue is proper in this Court under 9 U.S.C. § 4, in that this is the United States District Court having jurisdiction over the contractually specified site of arbitration, and 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

### The Franchise Agreement And The Parties' Arbitration Agreement

9.    On or about July 28, 2003, Marcos Martins entered into a written Janitorial Franchise Agreement with Coverall d/b/a Coverall of Boston pursuant to which Coverall granted Martins a franchise to operate a commercial janitorial business in the Boston, Massachusetts area.

10.    Under Section 21 of the parties' Franchise Agreement, the parties explicitly agreed that they would submit all disputes arising out of or relating to the Agreement, the validity of the Agreement or the parties' relationship to arbitration before the American Arbitration Association.  Section 21 of each Franchise Agreement provides, in pertinent part, that:

> [A]ll controversies, disputes, or claims between Coverall, its officers, directors, agents and/or employees (in their respective capacities) and Franchisee (and Franchisee's owners, officers, directors and/or any guarantors of this Agreement) arising our of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall, including those set forth in the Coverall Policy and Procedure Manual . . . shall be submitted promptly for arbitration.

> Arbitration shall be subject to the Federal Arbitration Act and, except as otherwise provided in this Agreement or agreed upon by the parties, the then current Rules of the American Arbitration Association for Commercial Arbitration.

> The arbitration shall take place in the Area in which the Franchisee conducts its business, and shall be administered by the office of the American Arbitration Association or as mutually agreed by the parties.

> \* \* \*

~BOST1:391126.v1

Franchisee and Coverall agree that arbitration shall be conducted on an individual, not class wide basis.

11.    Section 21.C of the parties' Franchise Agreement provides that "Should either Party incur attorney's fees in order to enforce the terms and conductions of this Agreement, including post-term covenants, whether or not an arbitration proceeding is instituted, the prevailing party shall be entitled to reimbursement by the other party of all litigation costs, including attorneys' fees."

12.    The parties' written arbitration agreement is valid, has not been revoked and is enforceable upon such grounds as exist at law or in equity.

13.    The parties' written arbitration agreement appears in a contract evidencing a transaction involving interstate commerce.

14.    The making of the parties' arbitration agreement is not at issue, nor is any failure to comply therewith.

15.    Coverall is not in default in proceeding with arbitration by failing, neglecting, or refusing to arbitrate under the parties' written agreement to arbitrate.

## Respondent's Refusal To Arbitrate The Parties' Disputes

16.    In or around early 2005, certain disputes arose between the parties. The disputes were subsequently submitted to non-binding mediation in accordance with the provisions of the parties' Franchise Agreement. The parties were not able to resolve their disputes.

17.    On August 30, 2005, Coverall filed an arbitration proceeding against Respondent seeking to resolve its various claims. That arbitration is captioned *Coverall North America, Inc. v. Marcos Martins*, Case No. 11-114-01898-05. Coverall's Demand for Arbitration seeks,

~BOST1:391126.v1

among other things, declaratory relief and attorneys' fees. (A true and correct copy of the Demand for Arbitration is annexed hereto as Exhibit A.)

18.    In a September 14, 2005 letter to the American Arbitration Association, Respondent's counsel stated that Respondent and seven other franchisees "dispute that there is a valid arbitration agreement between them and Coverall." The presumed basis for this belief is Respondent's contention that Respondent and seven other franchisees "should have been classified as employees of Coverall, rather than independent contractors" – an assertion that Respondent's counsel asserted would be part of a class action lawsuit to be filed against Coverall. (A copy of this letter is annexed hereto as Exhibit B.)

19.    Respondent's claim that he should have been classified as an employee of Coverall, rather than an independent contractor, arises out of or relates to "the relationship of the parties" and their Franchise Agreement, and therefore falls within the scope of the parties' written arbitration agreement.

### Specific Relief To Compel Arbitration

20.    Respondent's assertion that he is not bound to arbitrate his disputes with Coverall constitutes a failure, neglect and/or refusal on his part to arbitrate in accordance with the parties' written arbitration agreement.

21.    Petitioner has no adequate remedy at law.

22.    No previous Petition has been made for the relief requested herein.

### PRAYER FOR RELIEF

**WHEREFORE,** Petitioner Coverall North America, Inc. respectfully prays for the following relief against Respondent:

A.    An order pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, made in the manner provided by law for the making and hearing of motions,

compelling arbitration in accordance with the terms of the parties' arbitration agreement;

B.    An award of reasonable attorneys' fees, expenses and costs incurred by Coverall in this action; and

C.    Such other relief as the Court deems just and proper.

**COVERALL NORTH AMERICA, INC.,**

By its attorneys,

Michael D. Vhay (BBO #566444)
Traci S. Feit (BBO# 660688)
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA 02110-2600
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Dated: September 15, 2005

6

391126_1.DOC

grow their business. Coverall also provides its franchisees with training in state of the art cleaning methodologies. To provide franchisees with a firm footing in their new businesses and generate immediate cash flow, Coverall provides its franchisees with an initial customer base. Thereafter, franchisees may procure customers on their own or purchase additional business from Coverall.

3.    Respondent Martins is a resident of Massachusetts. Martins is a franchisee of Coverall.

### The Parties' Written Franchise Agreement

4.    On or about July 28, 2003, Martins, along with his then partner, Sarita Silva, entered into a written Janitorial Franchise Agreement (the "Franchise Agreement") with Coverall d/b/a Coverall of Boston pursuant to which Coverall granted Martins and Silva a franchise to operate a commercial janitorial business in the Boston, Massachusetts area. (A true and correct copy of the Franchise Agreement is attached hereto as Exhibit A).

5.    Martins and Silva paid $11,500 for the franchise they acquired, $5,000 of which was paid upon execution of the Franchise Agreement. The $6,500 balance of the franchise fee was financed pursuant to a July 28, 2003, promissory note which Martins and Silva executed in favor of Coverall.

6.    Under the Franchise Agreement, Coverall was required to provide Martins and Silva with one or more customer accounts totaling $2,000 in gross volume per month (the "Initial Business Package"). The Franchise Agreement provides that Coverall had one hundred twenty (120) days from the date on which Martins and Silva completed training to fulfill the Initial Business Package.

7.    Martins and Silva were not contractually obligated to accept any of the customer accounts offered by Coverall. However, in the event Martins and Silva rejected a customer account that was timely offered, the amount of that account would be credited towards Coverall's fulfillment of the Initial Business Package. Assuming the account was not unreasonably rejected, Coverall would nonetheless remain obligated to offer the amount of business rejected by Martins and Silva within a reasonable period of time after the expiration of the 120 day period.

### The Transfer And Release

8.    On or about July 13, 2004, Silva transferred all of her interest in the Franchise Agreement to Martins. (A true and correct copy of the Transfer Agreement is attached hereto as Exhibit B).

9.    As partial consideration for the Transfer Agreement, Martins and Silva agreed to release any and call claims they had or may have had by reason of the Franchise Agreement or the franchise relationship.

### The Relief Sought

10.    Martins and Silva completed training on August 9, 2003. As a result, Coverall had until December 8, 2003 to fulfill the Initial Business Package.

11.    Coverall offered Martins and Silva numerous accounts throughout the 120 day period. Martins and Silva accepted some of the accounts, rejected some of the accounts and, on other occasions, failed to respond to Coverall's efforts to determine whether they were interested in accounts. Coverall nonetheless continued to offer Martins and Silva accounts to fulfill the Initial Business Package.

~BOST1:389567.v1

3

12.   Martins has asserted that Coverall failed to satisfy its obligation to fulfill the Initial Business Package.   Coverall contends that it has fulfilled its obligations under the Franchise Agreement.

13.   Accordingly, there is an actual controversy between the parties in this case and a declaration of the rights of the parties would terminate the controversy or some part thereof.

14.   Coverall seeks a declaration that it has satisfied its obligation to fulfill the Initial Business Package under the Franchise Agreement.

15.   In the alternative, Coverall seeks a declaration that Martins' claims have been released.

16.   The Transfer Agreement provides, in part in Paragraph 5, that "[Marcos Martins] and [Sarita Silva] release and forever discharge Coverall and its successors and assigns of and from all manner of actions, causes of action, suits, debts, and sums of money, dues, claims, and demands whatsoever, in law or equity, which [they have] ever had or now [have] by reason of the Franchise Agreement, the granting of the Franchise ... or franchise relationship ..." (Ex. B, ¶ 5).

17.   Coverall was obligated to fulfill the Initial Business Package by December 8, 2003. Any claim Martins and Silva may have had for an alleged failure by Coverall to satisfy that obligation accrued on December 8, 2003 and therefore was released by the Transfer Agreement dated July 13, 2004.

18.   Finally, despite his contractual acknowledgment that he is an independent contractor and not an employee, and despite the nature of the parties' relationship, Martins has asserted that he is an employee and, as a result, is entitled to, among other things (i) time-and-a

~BOST1:389567.v1

4

half rate of pay for any hours worked in excess of 40 hours/week, (ii) payment for travel time, (iii) workers' compensation insurance, (iv) a certain level of wages and a guarantee of minimum wage, and (v) unemployment benefits. Coverall contends that Martins is a franchisee, not an employee, and seeks a declaration to that effect.

**WHEREFORE,** Coverall respectfully requests that the Arbitrator issue an award:

A.    Declaring: (i) that Coverall timely satisfied its obligation to fulfill the Initial Business Package under the Franchise Agreement or, in the alternative, declaring that any claims regarding Coverall's failure to fulfill the Initial Business Package were released; and (ii) that Martins is a franchisee, not an employee, of Coverall.

B.    Awarding Coverall the costs and fees incurred in this arbitration, as provided for in the parties' Franchise Agreement; and

C.    Such other and further relief as the Arbitrator deems just and proper.

**COVERALL NORTH AMERICA, INC.,**

By:    _____

One of its Attorneys

Michael D. Vhay (BBO# 566444)
**DLA Piper Rudnick Gray Cary US LLP**
One International Place, 21st Floor
Boston, MA 02110
(617) 406-6000

Norman M. Leon
**DLA Piper Rudnick Gray Cary US LLP**
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
(312) 368-2192

Dated: August 30, 2005

# COVERALL CLEANING CONCEPTS®

# JANITORIAL FRANCHISE AGREEMENT

COVERALL CLEANING CONCEPTS®
JANITORIAL FRANCHISE AGREEMENT
TABLE OF CONTENTS

| **Paragraph** | | **Page No.** |
|---|---|---|
| - | Information Regarding Franchisee and Franchise Package | 1 |
| 1 | Use of Trade Name, Service Marks, and Confidential and Proprietary Information | 2 |
| 2 | Term and Renewal | 3 |
| 3 | Territory | 3 |
| 4 | Initial Business and Guarantee | 3 |
| 5 | Additional Dollar Volume | 5 |
| 6 | Business and Management Services Provided By Coverall | 5 |
| 7 | Franchise and Other Fees | 7 |
| 8 | Refunds | 9 |
| 9 | Franchisee Business Operations | 10 |
| 10 | Franchisee Service to Customers | 11 |
| 11 | Keys and Security | 13 |
| 12 | Restriction on Use of Confidential Information | 13 |
| 13 | Franchisee is an Independent Contractor | 14 |
| 14 | Insurance | 14 |
| 15 | Indemnification | 16 |
| 16 | Assignment | 16 |
| 17 | Termination | 17 |
| 18 | Procedures After Termination | 18 |
| 19 | Non-Competition | 19 |
| 20 | Informal Dispute Resolution | 20 |
| 21 | Additional Remedies for Breach | 20 |
| 22 | Time to Assert Claims | 22 |
| 23 | Governing Law | 22 |
| 24 | Entire Agreement | 22 |
| 25 | Amendment | 22 |
| 26 | Waivers | 22 |
| 27 | Force Majeure | 22 |
| 28 | Severability | 22 |
| 29 | Notices | 22 |
| 30 | Successors Bound | 23 |
| 31 | Survival of Provisions | 23 |
| 32 | Captions | 23 |
| 33 | Guaranty | 23 |



FRANCHISE # *F773*

RECEIVED
AUG 1 4 2003
BY:

TE: This is for new agreements
(not for transfers or renewals)

**COVERALL NORTH**
**105 Central Stre**

**OVERALL OF BOSTON**
am, Massachusetts 02180

## JANITORIAL FRANCHISE AGREEMENT

THIS AGREEMENT (hereinafter referred to as "Agreement") is entered into by and between Coverall North America, Inc., dba Coverall of BOSTON        , a corporation organized and existing under the laws of the State of Delaware, hereinafter referred to as "Coverall," and *SARITA SILVA / MARCOS MARTINS* hereinafter referred to (singularly or collectively) as "Franchisee" for the purposes of allowing Franchisee to operate a business as a Franchisee of Coverall. Franchisee is doing business as a:

☐ Sole Proprietorship  ☑ Partnership  ☐ Corporation, incorporated under the laws of

Effective Date of Agreement: **The effective date of this Agreement will be the date it is signed by the Regional Director and Franchisee; provided, however, that if the Agreement is not signed by a corporate officer as provided on the last page of this Agreement, then the Agreement will not be effective.**

Term of Franchise ("Initial Term"): 20 years
**Franchise Package**

Package Purchased: P- *2000*

Monthly $ Volume of Initial Business: $ *2000.00*
Initial Business Offering Period: *126* days
(in which Initial Business shall be offered after Franchisee's completion of initial training - calculated per Paragraph 4A hereof)

Initial Franchise Fee: $ *11,500.00*

Down Payment: $ *5,000.00*

Amount Financed by Coverall: *6,500.00*
(with interest at 12% per annum)

Financing Period: *24* months
(equal consecutive monthly installments of principal & interest)

Amount of Each Monthly Installment: $ *305.98*

The first installment of principal and interest shall be paid on the last day of *Nov* , *03*

**REPRESENTATIONS** Franchisee makes the following representations: If Franchisee is a sole proprietor, partnership, or corporation, there is set forth below, as the case may be, the name, address and other information of the sole proprietor, of each partner of the partnership, or of each shareholder in the corporation:

Franchisee Name: *SORITA SILVA*
Address: *48 KINSMAN ST APT 2 LOWELL, MA 01850*
Phone: *978- 441 -0557*  Social Security Number: *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*  Percentage Interest*: *50%* *Sarita Silva*

Franchisee Name: *MARCOS MARTINS*
Address: *28 FORT HILL AVE APT 1 LOWELL MA 01852*
Phone: *978- 458- 0667*  Social Security Number:   Percentage Interest*: *50%* *Marco R. Mart*

Franchisee Name:
Address:
Phone:        Social Security Number:      Percentage Interest*:

*As to a partnership, this shall indicate the percent owned in the capital and/or profits of the partnership. As to a corporation, this shall indicate the percent owned of the outstanding stock of the corporation.

Federal I.D. # of Franchisee if a partnership or corporation:

Address for mailing notices to Franchisee:

Franchisee acknowledges receipt from Coverall of a Franchise Disclosure Document which describes the Franchise to be operated pursuant to the terms of this Agreement. Franchisee acknowledges receipt of a completed copy of this Agreement at least five (5) business days prior to its execution.

*Sarita Silva*  *07/28/03*         *Marcos Martins*  *07/28/03*
Franchisee's Signature  Date          Franchisee's Signature  Date

© 2003 Coverall North America, Inc.

## RECITALS:

A.     Coverall is the owner of certain trademarks and service marks, including the marks "Coverall®" and "Coverall Cleaning Concepts®;" and

B.     Coverall, as the result of the expenditure of time, skill, effort, and money, has developed and owns a distinctive system ("the System") relating to the establishment and operation of janitorial cleaning service businesses. The distinguishing characteristics of the System include, without limitation, methods, procedures, standards, and equipment for janitorial cleaning and business services; procedures for quality control and customer assistance; marketing concepts; bidding, contracting, and billing procedures; training, assistance, advertising, and promotional programs; all of which may be changed, improved, and further developed by Coverall from time to time; and

C.     Coverall, as part of its business operations, licenses the use of its name and service mark to Coverall franchised professional cleaning and maintenance businesses which provide cleaning, maintenance and janitorial services to commercial cleaning customers, and provides Coverall's franchisees with the various components of the System for use in their Coverall businesses; and

D.     Coverall, as part of its business operations, obtains customer accounts, which are contracts between Coverall and cleaning customers, under which Coverall delegates the performance of services to its franchisees; and

E.     Franchisee desires to utilize the trade name, service mark, reputation, techniques, and the System of Coverall, as a Coverall franchisee, in operating a commercial janitorial cleaning service business.

### TERMS OF AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained in this Agreement, the parties agree as follows:

### 1.     USE OF TRADE NAME, SERVICE MARKS, AND CONFIDENTIAL AND PROPRIETARY INFORMATION.

A.     The License.  Coverall grants to Franchisee a non-exclusive license, upon the terms and conditions contained in this Agreement, to use and display "Coverall®," "Coverall Cleaning Concepts®," "Coverall and Design®," "The Art And Science Of Cleaning®," "Making Your World A Cleaner Place®," "When It Has to be Absolutely Clean®," "Customers for Life®," and/or such other names and designs as Coverall may from time to time designate, as Franchisee's trademarks, service marks, trade names, logos, labels and designs (the "Marks"), but only in connection with the rendering of Franchisee's services in the commercial janitorial service business in the territory as described in Paragraph 3, and only on those items and in the form approved by Coverall. Nothing contained in this Agreement shall be construed to permit the use by Franchisee of the Marks in any medium, in any other manner or for any other purpose except as expressly provided.  Coverall expressly reserves all rights with respect to the Marks, as well as to any trade secrets, processes, methods of operation, and goodwill granted to Franchisee. Accordingly, Coverall reserves the sole right to institute administrative proceedings and/or litigation regarding the Marks. The Franchisee shall not have any right, title, or interest in or to the Marks, trade secrets, processes, methods of operation, or goodwill of Coverall. Coverall further reserves the right to modify, discontinue and/or change the Marks, name, and/or design. In the event of modifications, changes, or discontinuations, Franchisee will upon receipt of written notice, and at its sole expense, promptly discontinue use of the discontinued name and/or Marks and adopt and promptly begin use of the new or modified name and/or Marks, and promptly implement the modifications and/or changes to the System. Franchisee expressly and specifically waives any claims, demands, or damages arising from or related to the loss of the Marks (or any variation) and/or the loss of association with or identification with the Mark "Coverall®" arising out of Coverall's exercise of the above reservation. Franchisee agrees to use only the Marks designated by Coverall and to use the Marks only in the manner approved by Coverall. Franchisee agrees not to use the Marks or any name or design confusingly similar to the Marks in Franchisee's corporate or other legal or business name. Franchisee must promptly tell Coverall if Franchisee learns about unauthorized use of Coverall's confidential, proprietary, and copyrighted information.

B.     Termination of License.  Upon the expiration or termination of this Agreement and the license for any reason, Franchisee agrees that it will, immediately discontinue the use of the Marks, deliver and surrender to

(i) If Franchisee refuses to accept any customer account(s) timely offered to fulfill the Initial Business, Coverall shall be deemed to have fulfilled its obligations to offer customer accounts during the Initial Business Offering Period.

(ii) However, Coverall shall remain obligated to offer, within a reasonable period of time after the expiration of the Initial Business Offering Period (identified on Page 1), the amount of gross monthly dollar volume refused by Franchisee; provided, however, that if Franchisee unreasonably refuses to accept customer accounts offered within a reasonable time after the Initial Business Offering Period has expired, Coverall shall be deemed to have fulfilled its obligation to provide Initial Business for the dollar volume of the customer account(s) which has been unreasonably refused by Franchisee.

(iii) If Franchisee chooses to discontinue servicing a customer account(s) accepted as part of the Initial Business, Coverall shall be deemed to have fulfilled its obligation to provide Initial Business for the dollar volume of the abandoned customers account(s).

The time within which Coverall shall offer the Initial Business to Franchisee (the "Initial Business Offering Period," identified on Page 1), is calculated from the date of completion of Initial Training as follows:

(1) For Initial Business packages up to and including $3,000 gross dollar volume per month (all packages up to and including the P-3,000), one hundred twenty (120) days;

(2) For Initial Business packages exceeding $3,000 gross volume per month (all packages larger than the P-3000), one hundred twenty (120) days plus an additional thirty (30) days for each $1,000 (or portion thereof) in gross dollar volume per month over the initial $3,000.

Example:
Franchise Package:     $5,000
Initial Business Offering Period: 180 days from completion of training
Accordingly, if Franchisee purchases a P-5000 and completes Initial Training on March 1, all $5,000 in Initial Business must be offered on or before August 28 of that same year.

B.     Guarantee

Coverall provides a limited guarantee for the Franchisee's Initial Business. The guarantee applies only to customers lost through no fault of the Franchisee. Customers lost because of faulty workmanship, Franchisee's lack of trustworthiness or any other defaults by Franchisee are not guaranteed. Franchisee may qualify for either a twelve (12) month guarantee or a six (6) month guarantee, which begins on the date that Franchisee begins servicing the customer. If Franchisee qualifies for either guarantee, Coverall will replace the dollar volume of the lost customer, with one or more customers of equal dollar volume. If the replacement customer(s) has a dollar volume in excess of that lost by Franchisee, Franchisee may have to pay Coverall for the excess dollar volume.

This Initial Business guarantee is provided only under the following conditions:

(1) To qualify for the 12 month guarantee, for each month from the date Franchisee begins servicing an account, Franchisee must perform an inspection with the customer, and submit the Inspection Report, which must be signed by the customer, to Coverall no later than the 5th day following the inspection. *Franchisee must do all 12 inspections to qualify for the 12 month guarantee.*

(2) If Franchisee chooses not to perform the inspections, or if Franchisee fails to do an inspection in any month or fails to timely submit a properly completed Inspection Report, then Franchisee only qualifies for a 6 month guarantee.

(3) Dollar volume replaced by Coverall under either guarantee is only guaranteed to the extent that there is time remaining under the original guarantee. For example, if Franchisee loses an account after three months and Franchisee qualifies for the 6 month guarantee, the replacement account is only guaranteed for the time remaining, 3 months.

Exhibit A.1 to
          Janitorial Franchise Offering Circular
          Page 4 of 24



designee of Franchisee to attend the Initial Training instead of the person(s) signing this Agreement. Up to two employees of Franchisee, approved by Coverall, may also attend the Initial Training. There shall be no charge for the Initial Training.

      (2)    Additional Training. Any training to be provided to Franchisee by Coverall after the Initial Training, is "Additional Training." Additional Training shall include, but shall not be limited to, any training course offered in the Initial Training, or any other training provided by Coverall to Franchisee and/or its approved employee(s). Additional Training shall also include courses introducing new methods developed after the Initial Training. Franchisee's Additional Training may be offered through personal consultation and/or through group seminars. Personal consultations will be scheduled at the request of Franchisee and may be conducted by telephone or in person. The frequency and scheduling of group seminars will be determined at the sole discretion of Coverall. Additional Training shall be attended as provided in Paragraph 9A. The cost and method of payment for Additional Training shall be as provided in Paragraph 7F.

      (3)    Retraining of Franchisee. If (i) within a sixty (60) day period any two customers being serviced by the Franchisee complain to Coverall about Franchisee's faulty workmanship, lack of trustworthiness, or any other claimed default by Franchisee, or (ii) if at any time any customer being serviced by the Franchisee cancels Franchisee's services for faulty workmanship, lack of trustworthiness, or other default under that customer's account contract, or (iii) if, pursuant to Paragraph 10B of this Agreement, Coverall discontinues Franchisee's services to a customer, Coverall may, in any of these events, require retraining of Franchisee. In the event of retraining, the time within which to offer or provide any remaining Initial Business and/or Additional Dollar Volume will be suspended from the time Franchisee is requested to attend retraining until Franchisee completes retraining to Coverall's satisfaction. Retraining is Additional Training, and the Franchisee will be charged an Additional Training fee, in accordance with the provisions of Paragraph 7F.

      B.    Promotional and Sales Materials. Coverall shall make available to Franchisee, at Franchisee's expense, promotional or sales materials for use in developing Franchisee's business.

      C.    Billing, Collection, and Records. Coverall has the exclusive right to perform all billing for services and supplies provided by Franchisee. All customer payments made to Coverall and all credits due Franchisee shall be applied, in whole or in part, to Franchisee's then due or past due obligations under this Agreement and all other agreements, present and future, between Coverall and Franchisee. At the beginning of each month, Coverall shall invoice and collect payment from the customers for all services and supplies provided by Franchisee. On the last day of the month (if the last day of the month falls on a weekend and/or holiday, payment will be made on the next business day) following the month in which the services and supplies were provided by Franchisee, Coverall will pay Franchisee amounts collected from customers, excluding amounts retained by Coverall on Strategic Accounts, less amounts due Coverall for the fees described in Paragraphs 7 and 14, as well as note payments, transfer fees, equipment lease payments, advances, and any other amounts due Coverall or any third party lender through whom Franchisee has financed any purchase from Coverall.

      If the services performed by Franchisee on any Coverall customer account(s) are discontinued for any reason, unless the customer account(s) is guaranteed as provided in Paragraphs 4 and 5 above, Coverall shall have the right to apply the entire amount of any payment subsequently received by Coverall from the customer account(s) no longer serviced by Franchisee to the balance (principle and/or interest) of any amount owed by Franchisee to Coverall, including but not limited to, promissory note(s), line of credit or any other financing provided to Franchisee by Coverall. Coverall shall also have the right but not the obligation, to pay any amount remaining after applying the payment to Franchisee's obligations to Coverall, to any third party lender from whom Franchisee borrowed funds to finance any purchase from Coverall. Nothing contained in this Paragraph 6C, however, shall be construed to release the Franchisee from its obligations to Coverall for any amount remaining due after applying the funds received from the discontinued customer account(s).

      Coverall shall be entitled to recover from Franchisee all reasonable attorneys' fees, court costs, and expenses, and out-of-pocket costs which may be incurred by Coverall in enforcing payment by any customer accounts and/or payment by Franchisee and Franchisee's lenders, guarantors, or others. Coverall may, in its sole discretion, assign to Franchisee (in the form of a written assignment agreement) the right to enforce payment on any delinquent



B. Sales and Marketing Fee. A sales and marketing fee for additional dollar volume provided in accordance with Paragraph 5 shall be charged pursuant to this Paragraph 7B. The sales and marketing fee for each customer account or accounts shall be payable at the time an additional customer account or accounts are accepted by Franchisee. If the sales and marketing fees exceed $150.00, Coverall may agree to finance Franchisee's purchase(s) of additional dollar volume. The amount financed by Coverall shall be payable in equal monthly installments of principal and interest at the rate of twelve percent (12%) per annum over the period of time agreed upon by Franchisee and Coverall, which period shall not exceed twenty-four (24) months, unless financing is provided, at Coverall's discretion, through the line of credit described in Paragraph 7G or by a third party lender. Payment will commence on the last day of the first month (if the last day of the month falls on a weekend and/or holiday, payment will be made on the next business day) following the month that Franchisee begins servicing the account related to the amount financed, unless the purchase is financed through a line of credit, in which event, repayment shall be in accordance with the provisions of Paragraph 7G, or pursuant to the terms and conditions of any third party financing. Franchisee may be required to execute a promissory note, in a form substantially similar to that attached as Exhibit B, reflecting the amount financed.

The sales and marketing fee shall be calculated as set forth in the Coverall Policy and Procedure Manual, as it may from time to time be modified or revised by Coverall.

C. Royalty. A royalty in an amount equal to five percent (5%) of the amount billed customers for any and all services and supplies provided by Franchisee, shall be payable monthly on the last day following the last day of the month in which the services were performed. The sum total of the royalty and management fees may, at the discretion of Coverall, be subject to minimum payments of $50 per month in the first year of operation and $100 per month thereafter. The minimum fee may be adjusted for increases in the Consumer Price Index.

D. Management Fee. A management fee, as described in Paragraph 6E, hereof, in an amount equal to ten percent (10%) of the amount billed customers for any and all services and supplies provided by Franchisee, shall be payable monthly on the last day following the last day for the month in which the services were performed.

E. Special Services Finder's Fee. A fee shall be charged for special service contracts, for example, a one-time, non-recurring contract for services such as carpet cleaning, strip and waxing, or initial cleaning. The amount of the fee shall be twenty percent (20%) of the total special services contract price, unless Franchisee sells the job to the customer and furnishes all equipment, supplies and labor, in which case no fee will be charged. The total special services contract price equals the gross revenue from the contract to Franchisee before deduction of any other fee(s) payable to Coverall. Amounts billed customers for special services are subject to royalty and management fees.

F. Additional Training Fee. A fee shall be charged for Additional Training, as that term is defined in Paragraphs 6A (2) and (3). The Additional Training fee for each Additional Training course attended by Franchisee, and/or by Franchisee's employees, shall be Fifty ($50.00) Dollars. Coverall reserves the right to change the fee for any Additional Training course by setting forth the changed fee in the Coverall Policy and Procedure Manual as it may, from time to time, be amended. The Additional Training fee shall be due at the time of the Additional Training; however, Coverall may, in its sole discretion, upon the request of Franchisee, finance this Additional Training fee so that it is payable in up to twelve (12) equal monthly installments of principal and interest (which interest shall be at the rate of twelve (12%) percent per annum). If Coverall agrees to finance this Additional Training fee, Franchisee shall, prior to the Additional Training, sign a promissory note payable to Coverall, in the amount of the Additional Training fee. Notwithstanding the above, Additional Training fees totaling less than One Hundred Fifty ($150.00) Dollars in the aggregate will not be financed, and will be due at the time of the Additional Training.

G. Alternative Financing. Coverall reserves the right to extend, or make available to Franchisee alternative forms of financing, including the following:

1.) Line of Credit. The term "line of credit" shall mean a monetary amount which Coverall shall make available to Franchisee, and upon which Franchisee may draw, on a continuing basis, up to the maximum limit of the line of credit, for payment of a portion of Franchisee's Initial Franchise Fee, the purchase of Additional Dollar Volume (as defined in Paragraph 5A) and/or toward payment of any other item for which Coverall agrees to provide Franchisee financing. The initial limit of the line of credit shall be determined by Coverall, and Coverall may

A.    Initial Business. If Coverall does not (i) offer Franchisee, as provided in Paragraph 4A(i), all or any portion of the monthly dollar volume of Initial Business; or (ii) offer Franchisee, within a reasonable time after the expiration of the Initial Offering Period, as provided in Paragraph 4A(ii), a volume of Initial Business equal to that refused by Franchisee upon its initial, timely offer, provided Franchisee has not unreasonably rejected the post Initial Offering Period offer; or (iii) offer to replace guaranteed monthly dollar volume as provided in Paragraph 4B; then and in any event Franchisee will, upon Franchisee's request, be entitled to payment of an amount determined and payable as follows:

(1)    Determination of Amount Payable. The monthly dollar volume of Initial Business (i) not timely offered by Coverall to Franchisee under Paragraph 4A(ii); or (iii) not replaced by Coverall under Paragraph 4B, as the case may be, shall (a) be multiplied by two and eight-tenths (2.8) - the resultant figure shall be referred to as "the Gross Recalculated Amount;" (b) The current replacement cost of Franchisee's starter kit shall be subtracted from the Gross Recalculated Amount - the resultant figure shall be the "Amount Payable to Franchisee."

(2)    Payment of Amount Payable to Franchisee. If, at the time of the determination of the Amount Payable to the Franchisee, the Franchisee is indebted to Coverall, Franchisee's indebtedness shall be reduced by the Amount Payable to the Franchisee before the balance (if any) is paid to the Franchisee in cash or kind.

B.    Additional Dollar Volume. If Coverall is unable to provide or replace all or any portion of Franchisee's Additional Dollar Volume within a reasonable period of time, Franchisee's sole remedy shall be a refund of whatever sales and marketing fee was actually paid by Franchisee. If, at the time of this refund, the Franchisee is indebted to Coverall, this refund shall be applied to Franchisee's indebtedness, before the balance (if any) is paid to the Franchisee in cash or in kind.

C.    Sole Remedy. Franchisee acknowledges and agrees that the payment by Coverall to Franchisee of the Amount Payable to Franchisee, as provided in Paragraph 8A, shall be Franchisee's sole remedy in the event of Coverall's (i) failure to timely offer Initial Business; or (ii) failure to offer Franchisee, within a reasonable time after the expiration of the Initial Offering Period, a volume of Initial Business equal to that initially refused by Franchisee upon timely offer; or (iii) failure to replace guaranteed Initial Business. Franchisee further acknowledges and agrees that the refund to Franchisee, as provided in Paragraph 8B, shall be Franchisee's sole remedy in the event Coverall is unable to provide or replace any portion of Franchisee's Additional Dollar Volume. Franchisee agrees that this payment or refund is necessary as it would otherwise be difficult, if not impossible, to ascertain the damages incurred by Franchisee in the event of any failure by Coverall to timely offer or replace Initial Business, or to timely provide or replace Additional Dollar Volume. The parties agree that such payment or refund is not a penalty, but is a payment which Coverall must provide as liquidated damages as a consequence of Coverall's failure to offer or replace Initial Business, or to provide or replace Additional Dollar Volume. Upon Coverall's paying Franchisee, as provided in Paragraph 8A or 8B above as the case may be, Coverall shall be released from any obligation to offer or replace Initial Business, or to provide or replace Additional Dollar Volume, or to pay Franchisee any other damages.

9.    FRANCHISEE BUSINESS OPERATIONS.

A.    Franchisee To Attend Training Course. Franchisee shall attend the Initial Training as defined and described in Paragraph 6A(1), which is provided by Coverall to all new franchisees, and any other training courses Coverall may prescribe with respect to the needs of Franchisee or a particular customer serviced by Franchisee. The person signing this Agreement on behalf of Franchisee shall attend the Initial Training unless Coverall, in its sole discretion, agrees in writing to allow a designee of Franchisee to attend the Initial Training instead of the person signing this Agreement. Seminars shall be attended as provided in Paragraph 6A(1), although Franchisee's employees may also attend training. While there shall be no additional charge for the Initial Training, Franchisee shall be charged a fee for retaking Initial Training courses, including any retraining required under Paragraph 6A (3). The fee for the retaking of Initial Training courses and the manner of payment shall be as provided in Paragraph 7F.

B.    Franchisee to Abide by Policies and Procedures. Franchisee understands and acknowledges that every detail of the System is essential to Coverall, Franchisee, and other System franchisees in order to (i) develop and maintain quality operating standards, (ii) increase the demand for the services sold by all franchisees operating

Coverall Marks. Franchisee thus acknowledges that the requirements of this Paragraph are necessary to assure continuing public acceptance and patronage of the Coverall System.

A.     Franchisee to Contact Customer Accounts.   Customer Accounts are delegated to the Franchisee to service. In order for Coverall and the Franchisee to keep the customer accounts, Franchisee must provide satisfactory service. Communication between the Franchisee and the customer account is important for understanding the needs of the customer account and knowing whether or not the service being performed by the Franchisee is satisfactory. Therefore, it is important for the Franchisee to develop a strong relationship with the contact person at the customer accounts. To facilitate customer account retention, Franchisee shall contact each customer account serviced by Franchisee, which has regular monthly service revenues of $500 or less. For each month commencing on the date that Franchisee begins servicing the customer account, Franchisee must contact the customer account either in person or by telephone and obtain a rating of Franchisee's performance. Franchisee must complete an Account Contact Report for each customer account contacted and submit them to Coverall no later than the 5th day of the month following the contact. Should Franchisee fail to submit the Account Contact Reports required by this Paragraph 10A for any two (2) consecutive months, Coverall may remove the Franchisee from the customer account for which the Account Contact Reports were not submitted. This obligation to inspect is continuing, and is unrelated to the inspections which Franchisee must perform in order to qualify for the customer account guarantee described in Paragraphs 4B and 5B.

B.     Franchisee to Furnish Staff, Equipment, Materials, and Supplies.   In consideration of the franchise fee paid by Franchisee, Coverall will provide, upon the opening of Franchisee's business, the equipment and supplies listed in Exhibit A of this Agreement. Thereafter, Franchisee will replace equipment and supplies as needed and will provide all staff, equipment, materials, tools, and other supplies necessary to service customer accounts, including all janitorial services called for in each customer contract. In order to protect Coverall's Marks, all services will be performed in a good and workmanlike manner, satisfactorily to the customer account for which services are performed and in accordance with Coverall performance standards. Coverall may, at any time, inspect any premises serviced by Franchisee to assure that the quality of the services rendered is in accordance with Coverall standards. If Franchisee desires to cease servicing a customer account, Franchisee must give Coverall ten (10) days' written notice before ceasing service; in such event any remaining guarantee on the account shall be deemed to have been fulfilled, and Coverall shall have no obligation to replace the account.

C.     Protection of the Goodwill of the System.   Coverall, the Coverall System and Marks, and Coverall's Franchisees benefit from Coverall's goodwill, which arises out of Coverall's reputation in the market place. In order to protect Coverall and its Franchisees from the harm that arises from Franchisee activities that diminish Coverall's goodwill and Marks, Franchisee agrees that Coverall has the right to discontinue Franchisee's services to any customer upon the occurrence of any of the following:

(1)     Franchisee fails to perform its obligations to the customer's satisfaction; or,

(2)     The customer has made an oral or written complaint to Coverall; or,

(3)     Coverall or the customer has given Franchisee written notice of Franchisee's failure to perform and five (5) days after delivery of the notice either the customer or Coverall is not satisfied that Franchisee has performed; or

(4)     Franchisee receives three (3) written notices of failure to perform within a period of sixty (60) consecutive days, regardless of whether the Franchisee cured the deficiencies; or

(5)     Coverall receives a request from a customer to terminate its contract; or,

(6)     Coverall receives a request from a customer to replace the Franchisee; or

(7)     Franchisee services any customer other than as a Franchisee of Coverall; or

(8)     Franchisee fails to service a customer on any two (2) occasions within a period of sixty (60) days; or

specifications relating thereto and the means and manner of offering and selling same; and, all other components, specifications, standards, requirements and duties imposed by Coverall.

Franchisee shall not at any time copy, duplicate, record or otherwise reproduce any of the foregoing confidential information or material, in whole or in part, or otherwise make same available to any third party except as authorized herein. Upon the expiration or other termination of this Agreement, Franchisee shall return to Coverall all such confidential information including all materials, books, records, software and manuals deemed to be confidential which are in Franchisee's possession, custody, or control.

Franchisee and its employees who attend any or all of Coverall's initial training programs shall divulge only such confidential information as may be necessary, and then only to those full time and/or part time employees, agents, or independent contractors as must have access to it, in order to conduct the operation of the franchise business, and Franchisee shall take those precautions as shall be necessary to ensure that its employees retain the information in confidence.

If Franchisee is a proprietorship or partnership, Franchisee shall cause the proprietor or the partner, or other beneficial owner to execute Coverall's current Confidentiality/Non-Competition Agreement within ten (10) days of the execution of this Agreement or, in the case of an individual who subsequently assumes the status of proprietor, partner, or beneficial owner, within ten (10) days thereafter submit all executed Agreements to Coverall. If Franchisee is a corporation, Franchisee shall cause each officer, director, and shareholder to execute Coverall's current Confidentiality/Non-Competition Agreement within ten (10) days of the execution of this Agreement or, in the case of an individual who subsequently assumes the status of officer, director, or shareholder shall within ten (10) days thereafter submit all executed Agreements to Coverall. Franchisee, whether a sole proprietorship, partnership, or corporation, will cause each of its employees upon ten (10) days of the execution of this Agreement, or upon ten (10) days of hire of any employee, whichever last occurs, to execute a Coverall Confidentiality/Non-Competition Agreement.

13.     FRANCHISEE IS AN INDEPENDENT CONTRACTOR. Franchisee is and shall remain at all times a completely independent contractor in business for itself, and shall have no right or interest in or authority over Coverall or any of Coverall's property or business. Neither Franchisee, nor Franchisee's employees, are employees of Coverall. Neither Coverall nor Franchisee is the principal, agent, employer, employee, partner, officer, director, or owner of the other. Franchisee shall always hold itself out as an independent contractor in its dealings and communications with the public. Franchisee further agrees that it is not authorized to use the Marks or Substitute Marks in any capacity other than as provided in this Agreement, nor to sign on behalf of Coverall any checks, drafts, leases, bonds, mortgages, documents, bills, contracts, bills of sale or any other instruments in writing. Franchisee shall be free to conduct its business as it may deem best in providing services to the customer accounts, independently of the supervision, management, and control of Coverall, but Franchisee agrees to abide by all of the terms of this Agreement and all federal, state and local laws, OSHA requirements, and regulations of all government agencies having jurisdiction over the customer's premises or the activities conducted by Franchisee and all industry standards. Franchisee shall be responsible for all personal property, use, and other taxes assessed by governmental agencies. Franchisee shall be responsible for personal self-employment, income, and other taxes required to be withheld and hereby assumes full responsibility for payment of the employer's portion of any social security and other taxes required to be withheld for all of Franchisee's employees. Franchisee shall also pay and/or withhold taxes and premiums for unemployment and worker's compensation insurance for itself and all of its employees, as required by law. Franchisee shall provide Coverall, upon demand, proof of payment of all taxes due and compliance with all laws. Franchisee shall be responsible for all employment decisions and functions of its franchise business, including without limitation, those related to hiring, firing, training, wage and hour requirements, record keeping, supervision, and discipline of employees and order and sequence of work.

14.     INSURANCE. Franchisee shall be responsible for and shall indemnify and hold Coverall harmless for all losses, damages to property, or injuries to persons arising out of or connected with the performance or non-performance of Franchisee's business and services to customers, including any claimed damages for breach of security and claims or demands for damages resulting therefrom of whatever nature. Franchisee will obtain janitorial bonding in an amount not less than $100,000. Franchisee further agrees to maintain comprehensive liability insurance covering

The plans are subject to change, modification, and/or cancellation. Future changes in premiums, coverages, etc. will be set forth in the Policy and Procedure Manual.

15.    INDEMNIFICATION. Franchisee shall be solely responsible for the services and results of services performed by Franchisee and its employees, and shall indemnify and hold harmless Coverall and its affiliates, and directors, officers, and employees of each, and all other Coverall franchisees from all expenses, fines, suits, proceedings, claims, losses, damages, liabilities or actions of any kind or nature (including, but not limited to, costs and attorneys' fees) arising out of or in any way connected with Franchisee's operations. Franchisee further agrees that if Coverall is made a party to a lawsuit or other legal action in connection with the activities of Franchisee, then Coverall may tender the defense and/or prosecution of the case to the Franchisee who shall be responsible for diligently pursuing the case or action at Franchisee's expense, or Coverall may hire counsel directly to protect its interests and bill Franchisee for all costs and attorneys' fees incurred, and Franchisee shall promptly reimburse Coverall costs and expenses incurred. The obligations of Franchisee pursuant to this Paragraph shall survive the expiration or termination of this Agreement.

16.    ASSIGNMENT.

A.    Coverall's Right to Assign the Franchise Agreement. Coverall may, without the consent of the Franchisee, assign this Agreement, or Coverall's rights and duties under this Agreement, to any other entity or third party, whether affiliated with or independent of Coverall. Coverall may also assign to any other entity or third party, whether affiliated with or independent of Coverall, any promissory note or other negotiable instrument of Franchisee which is payable to Coverall, either in conjunction with or independent of this Agreement. Coverall's rights under this Agreement shall inure to the benefit of any assignee or legal successor to Coverall. Specifically, and without limitation to the foregoing, Franchisee expressly affirms and agrees that Coverall may sell its assets, its Marks, or its System outright to a third party; may engage in a private placement or public offering; may merge, acquire other corporations, or be acquired by another corporation; may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and, with regard to any or all of the above sales, assignments, and dispositions, Franchisee expressly and specifically waives any claims, demands, or damages arising from or related to the loss of the Marks and/or the loss of association with or identification with the Mark "Coverall" arising out of Coverall's exercise of any rights granted Coverall by this Paragraph 16A.

B.    Franchisee's Right to Assign the Franchise Agreement.

(1)    An assignment is defined as a voluntary or involuntary, direct or indirect, assignment, transfer, sale, gift, or other disposition by the Franchisee or any of its owners of any interest in this Agreement, the ownership of the Franchisee entity, or the franchise business, which assignment includes, without limitation: (i) assignment of ownership of stock or partnership interest; (ii) merger or consolidation or issuance of securities representing an ownership interest in the Franchisee entity; (iii) assignment in a divorce, insolvency, partnership, or corporate dissolution proceeding or otherwise by operation of law; and (iv) assignment in the event of death of the Franchisee or an owner of Franchisee, by will, declaration of or transfer in trust, or under the laws of intestate succession.

(2)    Franchisee may, with the written consent of Coverall obtained after thirty (30) days prior written notice to Coverall, which consent will not be unreasonably withheld, assign this Agreement to a person ("the assignee") meeting the qualifications then established by Coverall for granting new franchises, provided: (i) Franchisee provides Coverall a copy of any written agreements relating to the proposed assignment or transfer, and any additional information which Coverall may require in order to determine whether it will grant its consent to the proposed assignment or transfer; (ii) the assignee enters into the franchise agreement then used by Coverall for granting new franchises; (iii) Coverall shall assess Franchisee a transfer fee of $1,500; (iv) Franchisee pays to Coverall all amounts due by Franchisee to Coverall; (v) Franchisee executes confidentiality and non-competition agreements in assignee's favor and in Coverall's favor with terms and conditions the same as the non-competition covenant in Paragraphs 12 and 19 of this Agreement; (vi) the assignee shall have the ability to immediately be in compliance with all laws, regulations and ordinances governing commercial janitorial cleaning; and (vii) Franchisee executes a general release, in a form satisfactory to Coverall, of any and all claims against Coverall and its affiliates and their officers, directors, employees, and agents; and (viii) the shareholders or partners of any corporate or partnership assignee



possession or control, even temporarily, of any trustee in bankruptcy or appointed receiver or the making of a general assignment for the benefit of creditors.

D.      Franchisee's attempt to assign this Agreement or the franchise business, or any right or obligation hereunder, without first securing Coverall's written consent, upon thirty (30) days' written notice to Coverall.

E.      Franchisee's voluntarily abandoning the franchise business.

F.      Franchisee's having been charged with a work-related crime or any other crime that substantially impairs the goodwill associated with the Marks and System.

G.      Franchisee's failure on two or more occasions to comply with one or more of the provisions of this Agreement or any other agreement between Coverall and Franchisee.

H.      Franchisee's breach of Paragraph 19 of this Agreement.

I.      Franchisee's engaging in conduct that reflects materially and adversely upon the operation and reputation of Coverall's or Franchisee's businesses or the Marks or the System.

J.      Franchisee's monthly revenues are below $150 for two consecutive months or for each of any three months in a six-month period.

K.      A material misrepresentation in Franchisee's application to become a franchisee.

L.      At any time more than: (i) nine (9) months after the death or incapacity of Franchisee, or the appointment of a conservator or guardian for the person or estate of Franchisee, if Franchisee is an individual; or (ii) nine (9) months after the death or incapacity of any of the general partners, or the appointment of a conservator or guardian for the person or estate of any of the general partners, if Franchisee is a partnership; provided, however, that this Agreement shall not terminate if within nine (9) months this Agreement or the general partner's interest is assigned in accordance with the provisions of Paragraph 16.

If the termination results from default as defined in subparagraphs A, D, H, or L of this Paragraph 17, termination may occur upon the expiration of ten (10) days following written notice of default, or as otherwise provided by law, if by then the Franchisee has failed to cure the default. If termination results from default as defined in subparagraphs B, C, E, F, G, I, J, or K, of this Paragraph 17, termination may occur immediately, without notice or opportunity to cure, unless otherwise provided by law.

18.      PROCEDURES AFTER TERMINATION. Upon expiration, termination, or assignment of this Agreement for any reason, Franchisee shall cease to be a Coverall Franchisee and shall do all of the following acts and things, each of which shall survive the termination of this Agreement and shall remain an ongoing obligation of Franchisee:

A.      Immediately pay to Coverall all monies due to the date of termination, and cease doing business in accordance with the provisions of Paragraph 19. Any amounts due Coverall at or after Franchisee's termination may be offset against any amounts collected by Coverall on Franchisee's behalf.

B.      Immediately and permanently discontinue the use of all Coverall Marks, or any other name or designation indicating or tending to indicate that Franchisee is or ever was an authorized Coverall franchisee. Furthermore, Franchisee shall not promote or advertise the fact that Franchisee was formerly a franchisee or affiliate of the Coverall organization.

C.      Promptly surrender to Coverall all stationery, letterheads, forms, manuals, printed matter, films, books, cassettes, videotapes, and advertising containing Coverall Marks, including, but not limited to, the proprietary mark "Coverall," or any similar names or marks or designation indicating or tending to indicate that

Statistical Areas in which Franchisee's Coverall Regional office conducts business, or within a 100-mile radius of that Coverall Regional office, whichever distance is greater. Franchisee will not, during the time period and in the geographic area covered by this Paragraph 19B, interfere or attempt to interfere with previously existing Coverall cleaning customers by diverting or attempting to divert from Coverall any cleaning accounts which were being serviced by Coverall franchisees or subcontractors during the year preceding the date on which Franchisee left the Coverall system.

        C.     Persons Bound By Covenants Not To Compete.  Any person or entity having any legal or beneficial relationship to or interest in or traceable to, down, or through Franchisee is bound by the provisions of these covenants.  Such persons shall include, but shall not be limited to, Franchisee's family members.

        D.     Court Modification of Agreement.  The Franchisee agrees that this form of Agreement is prepared for use in many jurisdictions with differing public policies and that such public policies change. Accordingly, the Franchisee agrees that the prevailing non-competition restrictions set forth above may be modified by a Court to the extent necessary to make the non-competition agreements valid and enforceable against Franchisee.

        E.     Enforcement of Covenants Not to Compete.  The covenants not to compete may be enforced by Coverall, its successors and assigns.

    20.    INFORMAL DISPUTE RESOLUTION.

        A.     Mediation.  Except as is otherwise provided in Paragraph 20B, if a dispute arises out of or relates to this Agreement, or to the relationship of the parties, and if the dispute cannot be resolved or settled through negotiation, the parties agree that prior to the filing of any arbitration or other legal action consistent with the provisions of this Agreement, they will attempt, in good faith, to settle the dispute by non-binding mediation administered pursuant to the Commercial Mediation Rules of the American Arbitration Association, or as otherwise agreed upon by the parties.  The mediation shall take place in the Area in which Franchisee conducts its business (as defined in Paragraph 3), and shall be administered by a neutral mediator agreed upon by the parties.  In the event the parties are unable to agree upon a mediator within 15 days of the date on which either party requests mediation of a matter, the mediator shall be provided by the American Arbitration Association.  The costs of the mediation shall be shared equally by the parties.

        B.     Notwithstanding anything to the contrary in Paragraph 20A, if Franchisee's Coverall Franchise Agreement has expired or been terminated, or if Franchisee has abandoned or failed to operate the Franchise for more than 30 days, Coverall shall not be required to avail itself of non-binding mediation in matters dealing with (i) the collection, by Coverall, of royalties or management fees claimed to be owing to Coverall by Franchisee; or (ii) the collection, by Coverall, of amounts claimed to be owing to Coverall by Franchisee under any promissory notes, equipment purchases, or lines of credit.

    21.    ADDITIONAL REMEDIES FOR BREACH.

        A.     Arbitration.  Except as otherwise provided in Paragraphs 21A(14) and 21B, all controversies, disputes or claims between Coverall, its officers, directors, agents and/or employees (in their respective capacities) and Franchisee (and Franchisee's owners, officers, directors and/or any guarantors of this Agreement) arising out of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall, including those set forth in the Coverall Policy and Procedure Manual, which controversies, disputes or claims are not resolved in accordance with Paragraph 20, shall be submitted promptly for arbitration.

        (1)     Arbitration shall be subject to the Federal Arbitration Act and, except as otherwise provided in this Agreement or agreed upon by the parties, the then current Rules of the American Arbitration Association for Commercial Arbitration.

(i) the collection, by Coverall, of royalties or management fees claimed to be owing to Coverall by Franchisee; or (ii) the collection, by Coverall, of amounts claimed to be owing to Coverall by Franchisee under any promissory notes, equipment purchases, or lines of credit.

B.  Injunction and Specific Performance.  Notwithstanding anything in Paragraphs 20 and 21 to the contrary, Coverall shall be entitled to apply directly to a court of competent jurisdiction for the entry of preliminary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement or any other related agreement pertaining to Franchisee's use of the Marks; the obligations of Franchisee regarding confidentiality or non-competition; any assignments or attempted assignments of this Agreement by Franchisee; any matter relating to the ownership of the Franchise, and/or any other matter for which Coverall would have no adequate remedy at law. If Coverall secures any injunction or order of specific performance, Franchisee agrees to pay Coverall an amount equal to the costs incurred by Coverall in obtaining relief, including, without limitation, attorney's fees, litigation costs and expenses, as well as any damages incurred by Coverall as a result of Franchisee's actions.

C.  Attorneys' Fees.  Should either Party incur attorney's fees in order to enforce the terms and conditions of this Agreement, including post-term covenants, whether or not an arbitration proceeding is instituted, the prevailing party shall be entitled to reimbursement by the other party of all litigation costs, including attorneys' fees.

D.  Survival.  The parties agree that the provisions of this Paragraph 21 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

22.  TIME TO ASSERT CLAIMS.  Any and all claims and actions arising out of or relating to this Agreement, the relationship of Franchisee and Coverall, or Franchisee's operation of its business, brought by any Party hereto against the other, shall be commenced within two years from the occurrence of the facts giving rise to such claim or action, or such claim or action shall be barred.

23.  GOVERNING LAW.  This Agreement shall be interpreted and governed by the laws of the state in which the Franchise granted herein is located.

24.  ENTIRE AGREEMENT.  This is the full agreement of the parties.  Any matter which is not actually written down and included in this document is not a term of this Agreement.  To avoid any later misunderstanding about the exact terms of the Agreement, each Party affirms, by signing this Agreement, that it has not relied on any comment, promise, or representation not actually included in this Agreement.  By signing this Agreement, the parties mutually agree that no evidence shall be admitted in any proceeding as to the existence of any term or promise claimed to be a part of the Agreement unless that term is explicitly stated within the Agreement.  *DO NOT SIGN THIS AGREEMENT IF YOU ARE RELYING UPON ANY REPRESENTATION OR PROMISE NOT STATED IN THIS AGREEMENT.*

25.  AMENDMENT.  This Agreement may not be modified, altered, or amended except in writing executed by all of the Parties.

26.  WAIVERS.  Waiver by Coverall of any one or more defaults shall not operate as a waiver of successive or other defaults and all of Coverall's rights shall continue notwithstanding any such waiver or waivers.

27.  FORCE MAJEURE.  No party shall be liable for any loss or damage due to any delay in the performance of the terms (except for the payment of money) by reason of strikes, lockouts, and other labor troubles, fires, riots, wars, acts of terrorism, embargoes and civil commotion, or acts of God.  Any such delay shall extend performance only so long as such event is in progress.

28.  SEVERABILITY.  If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

29.  NOTICES.  Any notices to be given by either Party to the other may be effected in writing either by

Initial    Initial

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the day and year written above (see Page 1 of this Agreement).

(If Franchisee is a partnership, this Agreement must be signed by each partner. If Franchisee is a corporation, this Agreement must be signed by a duly authorized officer.)

THIS AGREEMENT SHALL NOT BE VALID UNLESS SIGNED BY (i) FRANCHISEE; (ii) AN AUTHORIZED REPRESENTATIVE OF COVERALL'S REGIONAL OFFICE; AND (iii) A CORPORATE OFFICER AT COVERALL'S CORPORATE OFFICE.

FRANCHISEE: _Sarita Silva MARCOS MARTINS_
(Print name of sole proprietor, partnership, or corporation.)

By: _Sarita Silva_                    _07/28/03_
                                        Date Signed

By: _Marcos Martins_                  _07/28/03_
                                        Date Signed

By: _____          _____
                                        Date Signed

COVERALL NORTH AMERICA, INC.

By: _____          _7/28/03_
                                        Date Signed

Title: _Regional DIRECTOR_

COVERALL OF BOSTON

ACCEPTED ON THIS _15th_ DAY OF _August_ , _2003_ .
(EFFECTIVE DATE OF AGREEMENT)

COVERALL NORTH AMERICA, INC.

By: _Jacqueline W. Vlaming_ , Vice President

© 2003 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 24 of 24

Initial   Initial   MM

RECYCLED

## COVERALL NORTH AMERICA, INC.

### CONSENT TO TRANSFER OF INTEREST IN JANITORIAL FRANCHISE AGREEMENT

Agreement made this 13th day of July_____, 2004, by and between Coverall North America, Inc. dba Coverall of Boston_____ ("Coverall"), Marcos Martins_____ [Franchisee partner who is remaining] ("Franchisee") Franchise # F773 and Sarita Silva_____ [Other Franchisee partner leaving] ("Partner").

#### Recitals

Franchisee and Partner executed a Janitorial Franchise Agreement and related documents (the "Franchise Agreement") with Coverall North America, Inc. on July 28, 2003_____ [Date of original franchise agreement].

Partner has decided to sever his relationship with Franchisee, and has assigned all of his [her] interest in the Franchise Agreement to Franchisee.

Franchisee has accepted the assignment and agrees to accept sole responsibility for the obligations of the Franchise Agreement.

Coverall consents to the assignment upon the terms and conditions of this Agreement.

#### Agreement

NOW THEREFORE, in consideration of the foregoing Recitals, which are incorporated in this Agreement as though fully set forth, the mutual covenants and agreements set forth below, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Coverall, Franchisee and Partner agree as follows:

1. **Transfer Date.** The date of this Agreement shall be the effective date of the assignment of the Franchise Agreement solely to Franchisee.

2. **Acceptance of Terms and Conditions of Franchise Agreement.** Franchisee accepts and reaffirms all of the obligations imposed by the Franchise Agreement executed by him [her] on July 13, 2004_____ [Date of this Agreement].

3. **Survival of Specific Provisions of the Franchise Agreement.** Partner acknowledges that the following provisions of the Franchise Agreement shall survive his assignment to Franchisee and that he [she] shall remain obligated to abide by the terms and conditions of these surviving provisions:

   A. Paragraph 1, "Use of Trade Name, Service Marks, and Confidential and Proprietary Information;"

   B. Paragraph 18, "Procedures After Termination"; and

C. Paragraphs 19(B) and (C), "Non-Competition."

4. **Consent to Transfer.**    Coverall consents to the assignment by Partner to Franchisee.

5. **Release and Waiver.**  Franchisee and Partner release and forever discharge Coverall and its successors and assigns of and from all manner of actions, causes of action, suits, debts, and sums of money, dues, claims, and demands whatsoever, in law or equity, which either Franchisee or Partner has ever had or now has by reason of the Franchise Agreement, the granting of the Franchise, or any alleged violations of the United States Federal Trade Commission's Trade Regulation Rule 436 relating to Disclosure Requirements, or the law of any State disclosure law, or deceptive or unfair trade practices laws or securities laws and/or other laws, statutes, rules or regulations of the United States or of any State or other governmental agencies or subdivisions, or the franchise relationship between Franchisee and Partner and Coverall. Partner releases any and all claims and waives all rights that he has or may have against Coverall on account of any distributions made pursuant to the Franchise Agreement to Franchisee either before or after the execution of this Consent.

6. **Indemnity.**  Franchisee agrees to indemnify and hold harmless Coverall from any claims that may arise on account of Coverall's consent to this Transfer, including but not limited to, claims by Partner to the proceeds of any distribution made by Coverall to Franchisee subsequent to the execution of this Consent. Indemnity shall include but not be limited to damage awards, amounts paid in settlement of any claim, attorneys' fees and costs.

7. **Acknowledgment.**  Franchisee acknowledges that subsequent to the execution of this Consent that he shall be solely liable to Coverall for all of the obligations imposed by the Franchise Agreement, including but not limited to the following present financial obligations:

   A.    The sum remaining due to Coverall for the Franchise Fee in the amount of $ _4767. 71_ , plus interest;

   B.    The sum remaining due to Coverall for Additional Business purchased in the amount of $ _-0-_ , plus interest; and

   C.    The sum remaining due to Coverall for purchases of equipment, for advances and supplies in the amount of $ _-0-_ , plus interest.

   IN WITNESS WHEREOF, Coverall, Franchisee and Partner have executed this Agreement on the date first written above.

Coverall North America, Inc.

By _____
Regional Director

Franchisee

_Marco Martins_

Partner

_Lourita Silva_

## PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.

Attorneys at Law
18 Tremont Street, Suite 500
Boston, MA 02108

Warren H. Pyle
David B. Rome
Harold L. Lichten*
Betsy Ehrenberg
Shannon Liss-Riordan**
Terence E. Coles
Katharine D. Shea

M. Amy Carlin
Nicole Horberg Decter**
Rebecca G. Pontikes
Alfred Gordon
Leah M. Barrault

*Also admitted in Maine
**Also admitted in New York

Tod A. Cochran
OF COUNSEL

Telephone (617) 367-7200
Fax (617) 367-4820

September 14, 2005

**VIA MAIL AND FACSIMILE** (401) 435-6529
Wilma Rooney
Michaela E. Gaudette
Case Managers
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914

Re:   Coverall North America, Inc.

Dear Ms. Rooney and Ms. Gaudette:

Coverall North America, Inc. ("Coverall") has filed eight arbitration demands against individuals whom I represent; their names and the AAA case numbers are listed below. I am writing to notify you that I represent these individuals and that you should communicate with me, rather than directly with them, in connection with these cases.

These individuals dispute that there is a valid arbitration agreement between them and Coverall. A class action lawsuit against Coverall will be filed in court imminently, asserting that these workers should have been classified as employees of Coverall, rather than as independent contractors, along with other related claims.

I request that these arbitration cases be stayed pending a judicial determination regarding whether these claims may be heard in court or instead whether they must be arbitrated.

In the event that the AAA does not immediately stay these arbitration cases, and proceeds with the administrative conference calls for these cases that are scheduled to begin tomorrow, September 15, 2005, I request that one call be

## PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.

held, rather than eight separate calls. Michael Vhay represents Coverall in each of these matters, and I represent each of the respondents; accordingly, it would be much more efficient to hold one conference call rather than eight separate calls.

Please let me know if you have any questions, and whether these cases may be stayed and the administrative conference calls accordingly postponed.

Sincerely,

Shannon Liss-Riordan

cc:    Michael Vhay, Esq.

Cases:

Coverall North America, Inc. and Joao Padihla
Case No. 11-114-01899-05

Coverall North America, Inc. and Wanor de Carvalho
Case No. 11-114-E-01903-05

Coverall North America, Inc. and Sandra Lisboa and Miriam Carvalho
Case No. 11-114-01902-05

Coverall North America, Inc. and Amilton DeSouza and Carlos Furtado
Case No. 11-114-01907-05

Coverall North America, Inc. and Adelson Sodre
Case No. 11-114-E-01904-05

Coverall North America, Inc. and Luciana Canestrano
Case No. 11-114-01901-05

Coverall North America, Inc. and Napoleo Pereira
Case No. 11-114-E-01906-05

Coverall North America, Inc. and Marcos Martins
Case No. 11-114-01898-05